UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Marine Polymer Technologies, Inc.


        v.                          Civil No. 06-cv-100-JD
                                    Opinion No. 2009 DNH 103

HemCon, Inc.


                        O R D E R

     Marine Polymer Technologies, Inc. brings a patent
infringement claim against HemCon, Inc., accusing the HemCon™
Bandage of infringing United States Patent No. 6,864,245 ("the
'245 patent").  The parties' summary judgment motions and
objections raise a claim construction issue, which has now been
briefed.[1]  The claim construction issue is whether the terms
poly-ß-1→4-acetylglucosamine and poly-ß-1→4-glucosamine, as used
in the asserted claims of the '245 patent, include a limitation
requiring them to be free of protein.


I.  Waiver

     Marine Polymer contends that HemCon waived the claim
construction issue by not pursuing the protein-free

_____

     [1]The court notes that Marine Polymer's format, using small-
font footnotes for citations, violates the local rule of this
district.  See LR 5.1(a).

interpretation during the first claim construction.  "Litigants waive their right to present new claim construction disputes if they are raised for the first time after trial."  <u>Cordis Corp. v. Boston Scientific Corp.</u>, 561 F.3d 1319, 1331 (Fed. Cir. 2009) (internal quotation marks omitted); <u>see also</u> <u>Eli Lilly & Co. v. Aradigm Corp.</u>, 376 F.3d 1352, 1360 (Fed. Cir. 2004).  In contrast, "a waiver will not necessarily occur if a party simply presented new or additional arguments in support of the scope of its claim construction."  <u>02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.</u>, 521 F.3d 1351, 1359 (Fed. Cir. 2008) (internal quotation marks omitted).

In the first claim construction briefing, HemCon asked that "biocompatible poly-ß-1→4-acetylglucosamine and biocompatible poly-ß-1→4-glucosamine" be construed to mean "material harvested from plant microalgae . . . that is free of protein, substantially free of other organic contaminants, substantially free of inorganic contaminants . . . ."  Marine Polymer interpreted the claim terms to mean "biomedically pure" poly-ß-1→4-acetylglucosamine and poly-ß-1→4-glucosamine "that reproducibly exhibits acceptably low levels of adverse bioreactivity, as determined by biocompatibility tests."  The terms biocompatible poly-ß-1→4-acetylglucosamine and biocompatible poly-ß-1→4-glucosamine were construed to mean:

2

polymers with their stated compositions (poly–ß–1→4–N–
acetylglucosamine and poly–ß–1→4–glucosamine) and with
low variability, high purity, and no detectable
biological reactivity as determined by biocompatibility
tests.

For purposes of summary judgment, HemCon contends that the

asserted claims in the patent are limited to materials that are

free of protein.  Marine Polymer does not cite a case that

supports waiver in this context.  The issue has not been waived.


II.  Judicial Estoppel

HemCon asserts that Marine Polymer is judicially estopped

from arguing that the limitation from the court's previous claim

construction, "high purity," permits the poly–ß–1→4–

acetylglucosamine and poly–ß–1→4–glucosamine claimed to contain

protein.  Judicial estoppel "prevents a party from prevailing in

one phase of a case on an argument and then relying on a

contradictory argument to prevail in another phase."  Zedner v.

United States, 547 U.S. 489, 504 (2006) (internal quotation marks

omitted).  While the doctrine of judicial estoppel is not clearly

defined, courts consider certain factors to determine its

applicability:  (1) whether the arguments are clearly

inconsistent, (2) whether the court adopted the first argument,

which would lead to inconsistent results, and (3) whether the

party's inconsistent arguments would cause an unfair advantage or

3

detriment to the opposing party.  <u>New Hampshire v. Maine</u>, 532
U.S. 742, 750-51 (2001); <u>accord</u> <u>Decisioning.com, Inc. v.</u>
<u>Federated Dep't Stores, Inc.</u>, 527 F.3d 1300, 1313 (Fed. Cir.
2008).  In the First Circuit, the first two factors are necessary
to find judicial estoppel, and the party offering inconsistent
positions need not have benefitted from the court's acceptance of
its first argument.[2]  <u>Thore v. Howe</u>, 466 F.3d 173, 182 (1st Cir.
2006).

During the initial claim construction process, HemCon argued
that the claims of the '245 patent were limited to microalgae
sources while Marine Polymer argued that the claims did not
include a source limitation.  HemCon contends that because Marine
Polymer was successful in the initial claim construction, it is
now estopped from arguing that poly-ß-1→4-acetylglucosamine and
poly-ß-1→4-glucosamine, which was construed to have "high
purity," can include detectable protein.  More specifically,
HemCon contends that Marine Polymer previously argued that the
'245 patent claims solved the problem of impure chitin, from both
crustacean and microalgae sources, and now contradicts that

_____

[2]"Whether judicial estoppel applies [in a patent case] is a
matter of regional circuit law."  <u>Minn. Mining & Mfg. Co. v.</u>
<u>Chemque, Inc.</u>, 303 F.3d 1294, 1302 (Fed. Cir. 2002).

4

position by arguing that the claims do not require protein-free poly-ß-1→4-acetylglucosamine and poly-ß-1→4-glucosamine.

Marine Polymer did not argue in the course of the first claim construction that biocompatible poly-ß-1→4-acetylglucosamine and poly-ß-1→4-glucosamine, as used in the asserted claims of the '245 patent, was protein free. HemCon's theory is that Marine Polymer argued against a source limitation based on its identification of the problem solved by the '245 patent that prior art material contained proteins and other contaminants.[3] HemCon then infers that Marine Polymer relied on a theory that the '245 patent claimed protein-free poly-ß-1→4-acetylglucosamine and poly-ß-1→4-glucosamine from all sources.

HemCon's judicial estoppel theory is difficult to follow. Even assuming that Marine Polymer relied on an argument that the '245 patent solved the problem of prior art chitin that had protein and other contaminants, which HemCon has not established, that position would not clearly contradict Marine Polymer's current position that the claims do not include a protein-free limitation. Therefore, judicial estoppel does not bar Marine Polymer's arguments here.

---

[3]Although HemCon quotes sections that it represents are from Marine Polymer's brief, it does not provide citations that would allow the court to find the quoted sections.

III.  <u>Claim Construction</u>

"Claim construction is an issue of law." <u>Felix v. Am. Honda
Motor Co., Inc.</u>, 562 F.3d 1167, 1176 (Fed. Cir. 2009).  The
patent claims define the invention for purposes of an
infringement action.  <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312
(Fed. Cir. 2005).  "[T]he words of a claim are generally given
their ordinary and customary meaning," which is "the meaning that
the term would have to a person of ordinary skill in the art in
question at the time of the invention." <u>Id.</u> at 1312–13 (internal
quotation marks omitted).  "[T]he court looks to those sources
available to the public that show what a person of skill in the
art would have understood disputed claim language to mean.  Those
sources include the words of the claims themselves, the remainder
of the specification, the prosecution history, and extrinsic
evidence concerning relevant scientific principles, the meaning
of technical terms, and the state of the art." <u>Id.</u> at 1314.

As a preliminary matter, Marine Polymer contends that the
claim construction issue raised by HemCon cannot be addressed
because it requires construing a term used in the court's
previous claim construction rather than a disputed term in an
asserted patent claim.  <u>See E-Pass Techs., inc. v. 3Com Corp.</u>,,
473 F.3d 1213, 1220 (Fed. Cir. 2007).  Specifically, Marine
Polymer argues that HemCon is seeking interpretation of the term

6

"high purity," used in the previous claim construction.  Although parts of HemCon's brief improperly suggests an interpretation of the term "high purity," that is not the term which is being construed.  Instead, the terms poly-ß-1→4-acetylglucosamine and poly-ß-1→4-glucosamine, as used in the asserted claims of the '245 patent, are construed to determine whether the patent claims include a protein-free limitation.

A.  <u>Claims</u>

        The terms poly-ß-1→4-acetylglucosamine and poly-ß-1→4-glucosamine are referred to, collectively, as p-GlcNAc.  Neither the asserted claims nor any of the other claims of the '245 patent include an express limitation that the p-GlcNAc claimed is protein free.  The claims do not define p-GlcNAc with respect to protein.  Each claim addresses either biocompatible poly-ß-1→4-N-acetylglucosamine or biocompatible poly-ß-1→4-glucosamine with differing numbers of monosaccharides, molecular weights, amounts of deacetylization, or elution test scores.  Therefore, the claims alone do not resolve the claim construction issue as to whether p-GlcNAc claimed in the '245 patent is protein free.

B.  <u>Specification</u>

To determine how one skilled in the art would interpret a particular claim term, the court considers the disputed term in light of the entire patent, including descriptions of the invention provided in the specification.  <u>Computer Docking Station Corp. v. Dell, Inc.</u>, 519 F.3d 1366, 1373–74 (Fed. Cir. 2008).  Limitations, however, cannot be taken from statements in the specification and imported into the claims.  <u>Id.</u> at 1374.  "[T]he distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice."  <u>Phillips</u>, 415 F.3d at 1323.

The Federal Circuit advises courts to remain focused "on understanding how a person of ordinary skill in the art would understand the claim terms."  <u>Id.</u>  "That balance turns on how the specification characterizes the claimed invention."  <u>Alloc, Inc. v. Int'l Trade Comm'n</u>, 342 F.3d 1361, 1370 (Fed. Cir. 2003).  The court must decide "whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment."  <u>Id.</u>; <u>accord</u> <u>Praxair, Inc. v. ATMI, Inc.</u>, 543 F.3d 1306, 1324 (Fed. Cir. 2008).

8

Patent claims are not limited to specific or preferred embodiments that are described in the specification, even if the specification describes only one embodiment.  <u>Phillips</u>, 415 F.3d at 1323.  On the other hand, "when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'"  <u>Bell Atl. Network Servs., Inc. v. Covad Communc'ns Group, Inc.</u>, 262 F.3d 1258, 1271 (Fed. Cir. 2001); <u>see also</u> <u>Computer Docking</u>, 516 F.3d at 1374 ("repeated and definitive remarks in the written description could restrict a claim limitation to a particular structure"); <u>Andersen Corp. v. Fiber Composites, LLC</u>, 474 F.3d 1361, 1366-68 (Fed. Cir. 2007).  Similarly, when a family of patents shares a common specification that "repeatedly and consistently describes . . . the claimed inventions" using a particular limitation or describes the "overall inventions" in a way that leads to the "inescapable conclusion" that all of the patent claims share a limitation, that limitation is read into the claims by implication.  <u>Microsoft Corp. v. Multi-Tech Sys., Inc.</u>, 357 F.3d 1340, 1347-48 (Fed. Cir. 2004) (citing <u>SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.</u>, 242 F.3d 1337, 1342 (Fed. Cir. 2001)).  Using a phrase such as "the present invention" in a shared specification may describe the invention as a whole, thereby

9

limiting the meaning of the claim terms to that description,
unless that conclusion is contrary to the context of the entire
specification or the prosecution history.  Netcraft Corp. v.
eBay, Inc., 549 F.3d 1394, 1398 (Fed. Cir. 2008).

HemCon asserts that the '245 patent specification
demonstrates that the p-GlcNAc of the invention is free of
protein, making that limitation part of each of the claims.
Marine Polymer disputes HemCon's interpretation of p-GlcNAc based
on the specification.  Noting that the '245 patent is one in a
family of related patents, which share the same specification,
Marine Polymer argues that the "free of protein" limitation
included in parts of the specification applies to some but not
all of the patents in the family.[4]  Marine Polymer contends that
the specification does not require the protein limitation in the
'245 patent claims and warns against importing limitations from
the specification into the claims.

The Abstract states:  "The p-GlcNAc of the invention is a
polymer of high molecular weight whose constituent monosaccharide
sugars are attached in ß-1→4 conformation, and **which is free of
proteins**, and substantially free of single amino acids, and other

---

[4]As the court noted in the prior claim construction order,
the shared specification is an impediment to a clear
understanding of the scope of each patent.

organic and inorganic compounds." (Emphasis added.)  The same
definition is repeated in the Introduction, "[t]he p–GlcNAc of
the invention is a polymer of high molecular weight whose
constituent monosaccharide sugars are attached in a ß–1→4
conformation, and **which is free of proteins**, and substantially
free of single amino acids, and other organic and inorganic
contaminants."  Col. 2, ll. 65, Col. 3. ll. 1–5 (emphasis added).
The "Summary of the Invention" section of the '245 specification
also states that "[t]he p–GlcNAc of the invention is a polymer of
high molecular weight whose constituent monosaccharides are
attached in a ß–1→4 conformation, and **which is free of proteins**,
substantially free of other organic contaminants, and
substantially free of inorganic contaminants."  Col. 4, ll. 11–15
(emphasis added).

      In the Detailed Description of the Invention, p–GlcNAc is
addressed in more detail.  There, the p–GlcNac of the invention
is described as "a polymer of high molecular weight" with a
corresponding number of "N–acetylglucosamine monosaccharides
attached in a ß–1→4 configuration" and with a preferred number of
N–acetylglucosamine monosaccharides.  Col. 9, ll. 16–25.  No
mention is made of protein in the first paragraph of the Detailed
Description.

11

The Detailed Description continues in the second paragraph to explain that the p-GlCNAc of the invention has very low variability and very high purity, which are demonstrated "by chemical and physical criteria."  The chemical and physical criteria referred to are "chemical composition and non-polysaccharide contaminants."  Col. 9, ll. 28-31.  Chemical composition and contaminant data from two different purification methods ("Mechanical Force Method" and "Chemical/Biological Method") are shown in Table I.  The Detailed Description explains that "as is also shown in Table I, the p-GlCNAc produced is **free of detectable protein contaminants,** is substantially free of other organic contaminants such as free amino acids, and is substantially free of inorganic contaminants such as ash and metal ions . . . ."  Col. 9, ll. 39-44 (emphasis added).

That section further explains that "preferably, the p-GlCNAc of the invention contains a profile as exemplified in the Experimental Data on p-GlCNAc mats in Table I."  Col. 9, ll. 52-54.  The part of Table I, labeled "Experimental Data on p-GlCNAc Mats," shows results for the two different production methods, the Mechanical Force Method and the Chemical/Biological Method.  Under both methods, the average values for protein are  "0.00."  Although the specification does not define biocompatibility to require protein-free p-GlCNAc, the p-GlCNAc used in the

12

biocompatibility tests was produced by the Mechanical Force
Method, which produces only protein-free p-GlcNAc.  Col. 42-43;
Col. 9 - 10, Table I.

"It is true that [the court] should not import limitations
from the specification into the claims."  ICU Med., Inc. v.
Alaris Med. Sys., Inc., 558 F.3d 1368, 1375 (Fed. Cir. 2009).  On
the other hand, however, the specification shows what a person of
ordinary skill in the art would understand the disputed term to
mean in the context of the patent.  Id.  The specification
describes the scope of the patent claims.  Revolution Eyewear,
Inc. v. Aspex Eyewear, Inc., 563 F.3d 1358, 1367 (Fed. Cir.
2009).  When the specification indicates that a term is limited
in a particular manner, the ordinary meaning of the term can be
inferred to include that limitation.  ICU Med., 558 F.3d at 1375.
It is improper to adopt an expansive construction of a disputed
term, which goes beyond the ordinary meaning of the term as
described in the specification.  Kinetic Concepts, Inc. v. Blue
Sky Med. Group, Inc.. 554 F.3d 1010, 1019 (Fed. Cir. 2009).

Here, the specification repeatedly refers to p-GlcNAc that
is protein free.  Nothing in the  specification indicates that
the claimed p-GlcNAc may include protein.  On the other hand,
while the specification includes general statements that the p-
GlcNAc of the invention is free of protein, the section devoted

13

to a detailed description of the p-GlcNAc claimed by the patent
describes it as having very low variability and very high purity,
without specifically limiting the amount of protein.  In that
section, the preferred embodiment is described as protein-free.

"Th[e] description of a preferred embodiment, in the absence
of a clear intention to limit claim scope, is an insufficient
basis on which to narrow the claims."  Decisioning.com, Inc. v.
Federated Dept. Stores, Inc., 527 F.3d 1300, 1314 (Fed. Cir.
2008).  "Even when the specification describes only a single
embodiment, the claims of the patent will not be read
restrictively unless the patentee has demonstrated a clear
intention to limit the claim scope using words or expressions of
manifest exclusion or restriction."  Liebel-Flarsheim Co. v.
Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004) (internal
quotation marks omitted).

The p-GlcNAc that is produced by the two purification
methods, the results of which are shown in Table I, are protein-
free.  Composition claims and method claims, however, are
directed to different inventions.  See Pfizer, Inc. v. Teva
Pharms., 518 F.3d 1353, 1357 (Fed. Cir. 2008).  Because the '245
patent, with composition claims, shares the specification with
patents for method claims, the description of the methods cannot
be read to limit the composition claims.

14

The claims and specification do not resolve the meaning of p-GlcNAc with respect to a protein limitation.  The protein-free limitation, which is at least a preferred embodiment, can be imported into the claims of the '245 patent only if the rest of the intrinsic evidence show a clear intent to limit the claims to protein-free p-GlcNAc.  See Abbott Labs. v. Sandoz, Inc., 566 F.3d 1282, 1290 (Fed. Cir. 2009).

C.  Prosecution History

The prosecution history of a patent also informs claim construction by showing the inventor's understanding of the invention and whether claims were limited in scope during patent prosecution.  Phillips, 415 F.3d at 1317.  "A disclaimer must be clear and unmistakable, and unclear prosecution history cannot be used to limit claims."  Cordis Corp. v. Boston Sci. Corp., 561 F.3d 1319, 1329 (Fed. Cir. 2009).  "When the application of prosecution disclaimer involves statements from prosecution of a familial patent relating to the same subject matter as the claim language at issue in the patent being construed, those statements in the familial application are relevant in construing the claims at issue."  Ormco Corp. v. Align Tech., Inc., 498 F.3d 1307, 1314 (Fed. Cir. 2007); see also Jonsson v. Stanley Works, 903 F.2d 812, 818 (Fed. Cir. 1990).

The family of fifteen related patents, of which the '245 patent is a part, began with Application No. 08/160,569, filed on December 1, 1993.[5]  The Abstract of the Disclosure of the '569 application states, in part, that "[t]he present invention relates to a purified, easily produced biocompatible [p-GlcNAc] polysaccharide species.  The p-GlcNAc of the invention is a polymer of high molecular weight whose constituent monosaccharide sugars are attached in a ß-1→4 conformation, and which is **free of proteins**, and substantially free of amino acids, and other organic and inorganic contaminants."  Pl. Br. (doc. no. 48) at 3. The '569 application explains that broad nature of the invention which includes "derivatives and reformulations of p-GlcNAc," and methods for purification, derivatization and reformulation, and uses of p-GlcNAc.  Id.

In support of the '569 application, the inventors submitted the declarations of David J. Cole, an assistant professor of surgery at the Medical University of South Carolina; George C. Ruben, a research professor of biology at Dartmouth College; and Sergio Finkielstein, one of the inventors.  Each declaration addresses the chitin material produced by a method invented by J. McLachlan in 1991, along with others, and distinguishes prior art

---

[5]Some of the related patents include an explicit protein-free limitation, while others, like the '245 patent, do not.

16

chitin from the invention that was the subject of the '569 application.  The declarations used to support the '569 application were resubmitted later in support of patent applications for the progeny of the '569 application.  Some of those patents have claims for protein-free p-GlcNAc, while others, including the '245 patent, do not have a protein-free limitation.

The declarants noted, as a distinguishing factor, the lack of contaminants in the p-GlcNAc of the '569 application and, in particular, that the p-GlcNAc of the invention was protein free. Dr. Cole stated that "the McLachlan material contains extensive ash and protein contamination . . . [which] could pose a possible safety threat . . ."  Doc. no. 134, Ex. 4.  He also said, "The '569 application [p-GlcNAc] material, on the other hand, represents an extremely promising candidate for use in biomedical applications . . . . the material shows virtually no contamination.  Specifically, the '569 application contains no protein and very little ash."  Id.  Similarly, Dr. Ruben "expressed [his] belief that the data in the ['569] application establishes, for the first time, a method which successfully yields a protein-free, fully acetylated [p-GlcNAc] polymer." Doc. no. 129, Ex. 11.  Dr. Ruben distinguished the McLachlan materials based on protein contamination.

In an amendment to the '569 patent, dated May 1, 1996, responding to a patent office action, the applicants described p–GlcNAc as protein free.  In their remarks, the applicants stated: "Importantly, the protein-free, fully acetylated [p–GlcNAc] compositions described and claimed in the instant application differ not merely in degree but in kind from the chitan of the cited art."  Doc. no. 129, Ex.8.  "In sum, the cited art does not suggest the claim protein-free [p–GlcNAc] of the invention . . . ."  Id.

HemCon argues that the prosecution history shows that the '569 application distinguished its invention based, in part, on claiming p–GlcNAc that was protein free.  Because the progeny of the '569 application used the same distinguishing factors, HemCon contends that all of the p–GlcNAC claimed by the family of patents includes the protein–free limitation.  Marine Polymer asserts that only the patents with a protein–free limitation are subject to the prosecution history disclaimer because the patents without the limitation do not include the same terms and, therefore, the disclaimer does not apply.

The prosecution history of a related patent can be relevant to claim construction if the history addresses a shared claim term.  Adv. Cardiovascular Sys. v. Medtronic, Inc., 265 F.3d 1294, 1305 (Fed. Cir. 2001).  "[T]he same claim term in the same

18

patent or related patents carries the same construed meaning."
Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1334 (Fed. Cir.
2003).  Statements made during the prosecution of related
patents, about shared claim terms, may show how the inventor
understood the invention.  Ventana Med. Sys. v. Biogenex Labs.,
473 F.3d 1173, 1184 (Fed. Cir. 2006).

     Marine Polymer contends that the prosecution history cited
by HemCon addresses "protein-free p-GlcNAc," claimed in some of
the related patents, not the p-GlcNAc claimed in the '245 patent
that lacks the "protein free" limitation.  Relying on Ventana and
Adv. Cardiovascular, Marine Polymer asserts that HemCon is
attempting to use prosecution histories from related patents to
construe different claim terms in the '245 patent and that the
present dispute, as in Adv. Cardiovascular, involves the absence
of a claim term, the protein-free limitation.  HemCon responds
that the inventors relied on the Cole Declaration, which limited
the p-GlcNAc of the invention claimed in the patent family to
protein-free p-GlcNAc, for both patents with an explicit protein-
free limitation and patents without that limitation.

     Marine Polymer acknowledges that the inventors relied on the
Cole Declaration in support of applications for related patents
that do not include an explicit protein-free limitation.  It
argues, however, that in those cases, the Declaration emphasized

19

the importance of safety for biomedical applications, which
includes both purity and batch reproducibiilty that were unique
to the p-GlcNAc of those inventions.  Marine Polymer also points
out that the patent examiners did not mention protein content in
allowing the related patents and that it made no explicit
disclaimer of p-GlcNAc with protein.

D.  Limitation in Related Patents

        Marine Polymer further argues that because claims in other
related patents include a protein-free limitation, the p-GlcNAc
of the claims in the '245 patent should not be construed to
include that limitation.[6]  A presumption exists that, "'unless
otherwise compelled, [] the same claim term in the same patent or
related patents carries the same construed meaning.'"  Z4 Techs.,
Inc. v. Microsoft Corp., 507 F.3d 1340, 1348 (Fed. Cir. 2007)
(quoting Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1334
(Fed. Cir. 2003) (emphasis added)); NTP, Inc. v. Res. in Motion,

_____

        [6]Marine Polymer relies on a theory of claim differentiation,
which, strictly speaking, does not apply in the context of claims
in different related patents as opposed to independent and
dependent claims in the same patent.  See Regents of Univ. of
Cal. v. Dakocytomation Cal., Inc., 517 F.3d 1364, 1375 (Fed. Cir.
2008) (doctrine of claim differentiation creates a presumption
that a limitation explicit only in a dependent claim is not in
the independent claim from which the claim depends); Halliburton
Energy Servs., Inc. v. M-I LLC, 514 F.3d 1244, 1251 n.3 (Fed.
Cir. 2008) (same).

Ltd., 418 F.3d 1282, 1293 (Fed. Cir. 2005) ("Because [the plaintiff's] patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across the asserted patents."). All terms in a claim are presumed to have meaning. Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1120 (Fed. Cir. 2004). A construction that avoids rendering a claim term meaningless or superfluous is preferred. See Mangosoft, Inc. v. Oracle Corp., 525 F.3d 1327, 1330-31 (Fed. Cir. 2008). On the other hand, claim construction tools provide guidance rather than rigid requirements. ICU Med., 558 F.3d at 1376; Netcraft Corp. v. eBay, Inc., 549 F.3d 1394, 1400 n.1 (Fed. Cir. 2008).

Marine Polymer provides excerpts from twelve of the fourteen other patents in the family of patents related to the '245 patent. Of those, eight patents, all dated between 1997 and 2000, include a protein-free limitation. The five more recent patents, including the '245 patent, do not include a protein-free limitation. Marine Polymer argues that if p-GlcNAc were construed to mean protein-free p-GlcNAc, that limitation, which is explicit in the earlier patents, would be rendered superfluous.

E.  Claim Construction

Given the rule that limitations are not to be imported from a patent specification into the claims and indications that the "protein free" limitation was intended for only some, but not all, of the related patents, it is not appropriate to add a protein-free limitation to the claims of the '245 patent. Therefore, the claim construction remains as held in the claim construction order issued on May 6, 2008.

Conclusion

For the foregoing reasons, the terms poly-ß-1→4-acetylglucosamine and poly-ß-1→4-glucosamine, as used in the asserted claims of the '245 patent, do not include a limitation requiring them to be free of protein.

SO ORDERED.

Joseph A. DiClerico, Jr.
United States District Judge

July 9, 2009

cc:  Julie M. Baher, Esquire
     Daniel R. Johnson, Esquire
     Joseph A. Kromholz, Esquire
     Richard B. McNamara, Esquire
     Lynda Q. Nguyen, Esquire
     Brian M. Poissant, Esquire
     Daniel D. Ryan, Esquire
     Ognian V. Shentov, Esquire
     Jonathan M. Shirley, Esquire
     Daniel E. Will, Esquire
     Leigh S. Willey, Esquire